138 So. 412

### RILEY–AKINS CHEVROLET CO. v. STATE.

4 Div. 565.

Supreme Court of Alabama.

Dec. 17, 1931.

J. C. Yarbrough, of Enterprise, for appellant.

Thos. E. Knight, Jr., Atty. Gen., for the State.

THOMAS, J.

The cause was heard before the court on oral evidence, and there was judgment of condemnation.

It is established by the decisions that the general bad character of a purchaser in the community of his residence or of his business is sufficient to impute notice to the seller (Auburn Sales Co. v. State, 219 Ala. 360, 122 So. 463; Wright Motor Co. v. State, 214 Ala. 120, 106 So. 868; Edwards v. State, 213 Ala. 122, 104 So. 255), and the place of general reputation relates to the place of the residence of the purchaser or that of his business or occupation (State ex rel. Biggs v. Frazier et al., 222 Ala. 180, 131 So. 442).

And, if the claimant had no knowledge or notice that the car was to be used for any unlawful purpose, or no knowledge or notice of any fact calculated to excite suspicion, so as to put a reasonably prudent person on inquiry as to such intended use, then inquiry on its part was not demanded. Hartzog-Ganey Motor Co. v. State ex rel. Reid, 222 Ala. 50, 130 So. 771; State ex rel. Biggs v. Frazier et al., supra.

The purchaser lived in another county than that of the sale, or that in which the law of transportation was violated. The seller testified that he was in possession of no facts that would put him on notice that the

car was to be used for the transportation of prohibited liquors; that he knew nothing of the sale until after it was made by his agent; that agent said he had been seeing the purchaser "for a couple of months off and on * * * don't remember just how long, but a short while"; that purchaser lived at Black in Geneva county; that he asked "Mr. Smith (who is in the room in there; I don't remember how he signs at the present time because it has been some time back anyway) and I called him, as I had on several occasions because I knew him pretty well and I used to sell some cars at Slocomb, and I called him—he was the shop foreman there and had been for a good long while—and asked him did he know him and he said he did, and I asked him did he know anything about his character, or was he a whisky-hauler, and was he good for his contracts and all like that, and he said he knew the boy and that he was of a nice family of people, and so far as this boy was concerned he had never known of anything wrong with him however; if he was a whisky-hauler, or a bootlegger he had never heard of it and he had seen him pretty often there in town and he wouldn't hesitate to sell him if it was himself." The witness further testified that he inquired of a citizen of Slocomb about the purchaser, who lived twelve or fifteen miles away, and he said "they were a fine family of people, he had known them for a long time; that he hadn't ever known any of them to be bootleggers, and he thought it would be all right and that he would be all right for his contract; that they were all very fine boys. I called another man in Black, Mr. Gibson—I think that is his name —he runs a grocery store. I asked him about this boy and he said as far as he was concerned that this boy was all right, that this boy was good for his contracts and he was a good boy and good for his contracts;" and to the question, "Did you ask him if he was a bootlegger, or anything like that, and what his reputation was?" witness answered: "I asked him if he was a whisky-hauler and he said he hadn't ever heard it." The witness stated on cross-examination that he "inquired about the McKenzie family and he (the party interrogated) brought in this boy himself," and said the boy "was a farmer"; that the two men at Slocomb said the purchaser was "good for his contract," and that they "did not know anything against him"; that he did not inquire of any official of Geneva county as to the general character or general reputation of said McKenzie.

The state's rebuttal evidence was to the effect that the purchaser's general character and reputation in the community in which he lived was bad, and that his general character in the community for transporting whisky and dealing in whisky was bad; that he (Hughes) had as an officer received re-

ports of his violation of prohibited liquor laws before the date of the sale; that these complaints of violation of liquor laws came from "citizens of Black" where McKenzie lived, and witness thought "the reports came from his neighbors." Such was the effect of the testimony of Mr. Hughes (Sheriff) and Mr. Harris, a law enforcement officer.

The claimant then offered as a witness Mr. Jernigan, who said that he had "never heard a thing in the world against the boy"; had not heard of his general character for dealing in whisky or transporting liquors in the community in which he lived; that he was trading cars with Mr. Jackson and Mr. Akin, and that he thought they inquired about the boy's reputation, and he thought he told them it was good; that he lived from fourteen to sixteen miles from McKenzie, and did not "go to Black hardly ever," and did not know the reputation of McKenzie; that he (Jernigan) was in the "mule business" at Slocomb at the time of the trial.

The witness Terry testified that he knew McKenzie; "saw him when he came up there" (at Dothan); did not know of his "selling liquor or dealing in liquor."

■ In this state of the evidence that supports the judgment, we will not interfere.

Affirmed.

ANDERSON, C. J., and BROWN and KNIGHT, JJ., concur.